IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| CANDICE WATTS, | ) | Case No. 5:22-CV-01250 |
| | ) | |
| Plaintiff, | ) | JUDGE PATRICIA A. GAUGHAN |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | THOMAS M. PARKER |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff, Candice Watts, seeks judicial review of the final decision of the Commissioner of Social Security, denying her application for disability insurance benefits ("DIB") under Title II of the Social Security Act.  Watts challenges the Administrative Law Judge's ("ALJ") negative findings, contending that the ALJ erred in evaluating the medical opinions of Nurse Practitioner Denise Flynn and Physician Assistant Gregory Barton.  Because the ALJ failed to apply proper legal standards in evaluating Barton's medical opinion, I recommend that the Commissioner's final decision denying Watts's application for DIB be vacated and that Watts's case be remanded for further consideration.

## I.    Procedural History

On February 4, 2020, Watts applied for DIB.  (Tr. 266-267).[1]  Watts alleged that she became disabled on January 1, 2019, due to (i) chronic obstructive pulmonary disease ("COPD"); (ii) bipolar disorder; (iii) anxiety; (iv) depression; and (v) sciatic nerve damage.

---

[1] The administrative transcript appears in ECF Doc. 6.

(Tr. 290, 310).  The Social Security Administration denied Watts's application initially and upon reconsideration.  (Tr. 184-191, 193-201).  Watts requested an administrative hearing.  (Tr. 263).

ALJ Gregory M. Beatty heard Watts's case telephonically on December 17, 2020 and denied Watts's application in a February 26, 2021 decision.  (Tr. 145-182, 105-133).  In so ruling, the ALJ determined that Watts had the RFC to perform sedentary work, except that:

> [Watts] [c]an never climb ladders, ropes, or scaffolds but can occasionally climb ramps and stairs, and can occasionally stoop, crouch, kneel, and crawl; [Watts] [c]annot work at unprotected heights or around moving mechanical parts, and cannot operate a motor vehicle; and must avoid concentrated exposure to dust, odors, fumes, and pulmonary irritants; and [Watts] [c]an have occasional interactions with supervisors, coworkers, and the public.

(Tr. 115).  On May 23, 2022, the Appeals Council denied further review, rendering the ALJ's decision the final decision of the Commissioner.  (Tr. 6-9).  On July 15, 2022, Watts filed a complaint to obtain judicial review.[2]  ECF Doc. 1.

## II.  Evidence

### A.  Personal, Educational, and Vocational Evidence

Watts was born October 25, 1979 and was 39 years old on the alleged onset date. (Tr. 310).  She had completed one year of college and had received specialized training in horticulture.  (Tr. 291).

### B.  Relevant Medical Evidence

Neither party contests the objective medical evidence, Watts's subjective symptom complaints and testimony, or the majority of opinion evidence.  Nor do they contest the ALJ's summary of it, save as to the opinions of Flynn and Barton.  *See generally* ECF Doc. 8; ECF Doc. 9.  Independent review does not reveal any material inconsistencies between the ALJ's summary of such evidence and the record before this court.  *Compare* (Tr. 105-133) *with*

---

[2] This matter is before me pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), and Local Rule 72.2(b).

(Tr. 350-1203).  Because of the limited nature of the parties' contentions and the scope of the ALJ's discussion they implicate, an independent recitation of the record is unnecessary, and I adopt the following abbreviated summary of the evidence from the ALJ's decision.[3]

### DDD[4] of the Lumbar Spine and Obesity

In terms of the alleged back pain, Ms. Watts does have a documented history of this as a chronic symptom, along with sciatica-type pain in the upper legs, dating back to at least a January 2016 consultative physical examination that was held in connection with a prior application for disability benefits [Tr. 361].  January 2016 x-rays of the lumbar spine revealed spondylitic defect at L5 with mild subluxation of L5 on S1 [Tr. 365].  In later years of limited treatment sought for acute-on-chronic back pain, such as in September 2016 and March 2018, a recurrence of back pain and leg pain occurred in November 2018, which was attributed to a lumbar muscle strain with sciatica [*see* Tr. 416, 910, 935].

While the findings on earlier x-rays substantiate the existence of degenerative disc disease at the lower lumbar and upper sacral spine as a medically determinable impairment years before the alleged onset date, Ms. Watts presented only on those very limited occasions with complaint of back pain and, by her own statements at several 2018 office visits, she was reportedly able to engage in heavy lifting at work, landscaping, and chopping wood [Tr. 409, 418].  She was observed to ambulate with a normal gait as well [Tr. 406].

The alleged onset date has no nexus with any documented medical treatment sought for pain or other significant physical health symptoms, and a motor vehicle accident in May 2019 initially produced left foot pain that occasioned use of ibuprofen [Tr. 403].  The emergency-room report contains an assessment for a simple acute lumbar strain injury, with clinical findings of nontender back region to palpation and with x-rays showing no acute abnormality [Tr. 928, 930].  The May 3, 2019 x-rays of the lumbar spine showed "mild" degree of anterolisthesis of L5 on S1, suspicious for spondylosis, and mild degenerative changes that "might cause chronic or intermittent low back pain" [Tr. 930].

In the same month as the car accident, she did present to her primary care practitioner M. Gregory Barton, P.A.-C., with a "flare" of sciatica in her right leg, but physical examination was positive for signs more of acute piriformis syndrome affecting the hip joint, and showed normal motion with forward flexion of the

---

[3] *See Biestek v. Comm'r of Soc. Sec*., No. 16-CV-10422, 2017 U.S. Dist. LEXIS 47762, at *2-3 (E.D. Mich. Feb. 24, 2017) (adopting an ALJ's summary of medical evidence and hearing testimony), *adopted by* 2017 U.S. Dist. LEXIS 47209 (E.D. Mich. Mar. 30, 2017), *aff'd by* 880 F.3d 7787 (6th Cir. 2017), *aff'd by* 139 S. Ct. 1148, 203 L. Ed. 2d 504 (2019).  *See also Paulin v. SSA*, 657 F. Supp. 2d 939, 942 (M.D. Tenn. 2009); *Hase v. Colvin*, 207 F. Supp. 3d 1174, 1177 (D. Or. 2016).
[4] Degenerative Disk Disease.

sacroiliac (SI) joints [Tr. 399-400].  Mr. Barton observed her as ambulating with a normal gait at several May-June 2019 office visits [Tr. 395, 397, 402].

Months later, in September 2019, Mr. Barton did not receive a complaint of any ongoing back or right leg pain, noted that she had "just started a job that is physically demanding," and observed grossly full 5/5 muscle strength in the bilateral lower extremities [Tr. 393].  While that office visit did observe tremor in the hands and fingers, it resolved with the arms outstretched, it did not impair grossly full 5/5 muscle strength in the upper extremities, it did not reduce grip strength in the left hand and only mildly reduced right grip strength to 4/5, and it could have related to the first performance of a new physically demanding job.  In any event, Mr. Barton has not subsequently observed tremor at 2020 office visits, and the claimant has not seen a neurologist per this medical record for evaluation of tremor.

Incidental findings on December 2019 CT scan of the abdomen and flank confirmed no change in the mild degree of spondylolisthesis and degenerative changes at the lumbosacral junction [Tr. 438-443].  During the first year of alleged disability, Ms. Watts was taking over-the-counter ibuprofen or Tylenol to address back pain, and she did not seek additional treatment(s) with her primary care practitioner [Tr. 352].

However, more consistent with her testimony and pre-hearing statements, the medical evidence since a February 4, 2020 motor vehicle accident (her second within a period of nine months) has caused more persistently mentioned low back pain and sciatica type pain from the lumbar spine [Tr. 493].  While treatment visits might have been curtailed in the early months of the COVID-19 Pandemic, Ms. Watts called Mr. Barton in early April 2020 with a report that she had fallen in her bathroom [Tr. 488-489].  She returned to in-person primary medical care on August 25, 2020 reporting more intense lumbar pain and in her legs to the knees, adding that she could not stand or walk for longer than 45 minutes before being "in tears" and that she had fallen trying to get out of the bathtub [Tr. 1112].  Mr. Barton's physical examination was not remarkable for signs of nerve-root compromise (*e.g.*, reflexes in the extremities were brisk and symmetric, and straight-leg raising test was negative) but was notable for lumbar paraspinal muscle tenderness [Tr. 1114].

Updated x-rays of the lumbar spine done at the August 2020 office visit revealed apparently progressive, more than mild, and "grade 2" spondylosis and spondylolisthesis at L5-S1 [Tr. 1118-1119].  Ms. Watts was advised to attend physical therapy.  Before she could attend the evaluation, she presented to the emergency department of Aulman Orrville Hospital in early September 2020 for 9/10 back pain that did not improve with the over-the-counter medications or by seeing a chiropractor, and she received a course of oral steroids (Medrol) [Tr. 1072-1073].  Lodine was prescribed by Mr. Barton (over the telephone) later

that month, with her report that the over-the-counter remedies were "not touching" the back pain [Tr. 1152-1153].

At a September 21, 2020 physical therapy evaluation, she displayed a flex position when walking, weakness in the trunk strength, and "major" limitations in range of motion at the lumbar spine [Tr. 1145, 1147]. 12 weeks of weekly physical therapy was recommended, but Ms. Watts attended none of those visits until, one month later on October 19, 2020, she requested to be discharged and cited fear and unwillingness to try exercises and being "scared to move" [Tr. 1173-1174].

The relatively recent medical treatment ordered through physical therapy, courses of oral steroids, and prescription of Lodine for chronic lumbar back pain and sciatica are partially consistent with the claimant's alleged worsening intensity of such symptoms over the past two years, but truly after the early 2020 motor vehicle accident. But the inattendance and overall lack of any real attempt at attending physical therapy or engaging even in home-based exercises that were demonstrated to her at the September 2020 evaluation are not convincing, as the therapist indicated that such exercises may help alleviate pain [Tr. 1173]. She confirmed in her testimony that she has not sought or been referred to a pain-management or orthopedic specialty group, such that she has maintained conservative treatment for the pain with her primary care practitioner. The medical treatment notes thus partially supported some limitations due to the pain in the back and upper legs attributable to DDD of the lumbosacral spine, as well as limitations in frequency of performing most postural positionings over a workday. But no evidence supports the alleged "walking staff" that she mentioned as using in the Function Report, and her testimony that she can sit for periods of one or two hours also suggests residual ability to perform primarily seated work activity with occasional standing or walking and lifting or carrying only light objects occasionally (10 pounds at most) and a negligible amount of weight frequently.

When further considering the claimant's additional medically determinable impairment of obesity, I find an exertional restriction to the regulatory range of sedentary work further supported. Ms. Watts has the impairment of obesity by clinical diagnosis and by medically recorded vital statistics of her height (5 feet and 2 inches) and weight (ranging from 310 pounds as of late 2018 up to 349 pounds by August 2020) and corresponding body mass index (BMI) at all points well above 30 and specifically between 57 and 63 (SSR 19-2p) [*see* Tr. 378, 401, 406, 516, 1114, 1195]. Her primary care practitioner has assessed "super obesity," appears to have attributed weight gain to the effect of long-term use of psychotropic medication for bipolar disorder, and offered "e-coaching" and a consult with a bariatric surgeon as treatment options [Tr. 1125]. The physical therapist noted comorbidities that likely intended (though not specified) obesity as included therein [Tr. 1145].

Additionally, on October 8, 2020, Ms. Watts attended a functional capacity evaluation at her primary care practitioner's referral, and Michelle Kunkle,

O.T.R./L., observed morbidly obsess body habitus with adipose tissue that limited mobility, in specific reference to spinal range of motion being limited for flexion, extension, and lateral bending [Tr. 948-949]. Ms. Kunkle also rated strength in the lower and upper extremities as reduced to 4.5 and noted that Ms. Watts could not perform rapid forward-bending or squatting 10 consecutive times, was not able to kneel, walked 5400 feet of distance with an antalgic pattern, noticeably shifter her weight after standing for three minutes and voiced a complaint of increased (but moderate) pain, and lifted 15 pounds maximally and carried 10 pounds (*Id.*). In contrast, she observed sitting for one continuous hour that did have some in-chair shifts of body weight but no reports of increased pain; and she noted not loss of balance during the assessment.

These observations from October 2020 FCE [functional capacity evaluation] lend further support to a combined effect of obesity and pain attributable to DDD of the lumbosacral spine as preventing the claimant from continuously or even frequently standing or walking during a workday, lifting or carrying more than 10 pounds occasionally, performing most postural positionings occasionally except for unlimited balancing ability, and being precluded from ever safely climbing ladders, ropes, or scaffolds and similarly needing to avoid all work at unprotected heights, around moving mechanical parts, or involving operation of a motor vehicle. Still, the FCE also supports the ability to sit for continuous periods, and the other medical evidence combined with the claimant's testimony shows no significant limitation in sitting for periods of up to two hours between typical rest breaks of an eight-hour workday and for six (or more) total hours, so long as any standing or walking is at most two total hours as in sedentary work. Such sitting ability is further evidenced by the claimant's response to a questionnaire administered by Ms. Kunkle at the FCE, which indicated that her most comfortable position is sitting, that she can drive for one to two hours before she would need to get out and stretch, and that she sits for the majority of the time in a typical day [Tr. 950].

As indicated above, the claimant's alleged COPD is not supported by objective medical evidence as a medically determinable impairment, but the obesity combined with ongoing tobacco use could reasonably account for the recurrent episodes of coughing spells and the more recent initiation of a prescribed daily inhaler (Atrovent). Obesity would also warrant an additional environmental limitation for the claimant needing to avoid any concentrated exposure to dust, odors, fumes, and similar pulmonary irritants in the work setting.

Lastly, while spinal range of motion was observed to be limited partly because of obese body habitus and adipose body tissue, neither obesity nor any other medically determinable impairment(s) is shown to have caused the claimant's reportedly diminished sensation in her thumbs, index fingers, and middle fingers during the October 2020 FCE [Tr. 948]. Her performance on tasks gauging grip strength and pinch strength and manual dexterity (nine-hole peg test) are not supported by an impairment(s) in the actual longitudinal treatment records. While reaching out, forward (in front the body), and upward were also limited, again lacking is any

medically determinable impairment affecting the shoulders or upper extremities that could cause such functional limitations (without noted symptom or medical signs in the treatment notes), and obesity is not attributed to the limited performance on reaching [Tr. 948].  I note that the claimant had alleged in the Function Report being limited in almost every work-related physical ability except for using her hands [Tr. 318], and she did not mention any problems with using her hands-fingers in testimony at the December 2020 hearing.  Accordingly, I reject the post-hearing contention from her representative that the FCE is substantial medical evidence that, standing alone, supports any limitations in her abilities to grip objects or to reach in any direction with the upper extremities.  I find all manipulative ability to be unlimited based on the substantial medical evidence of record, which at most reflects treatment for chronic low back pain and upper leg pain and sporadic treatment for coughing.

### *Mental Impairments*
Returning to the claimant's other reasons for disability also because of bipolar disorder, depression, and anxiety, I incorporate herein from the preceding Finding all the points of relevant medical evidence and other evidence supporting a moderate limitation caused by her medially determinable mental impairments in the "paragraph B" criterion of interacting with others, but otherwise mild limitation in the other three broad areas of mental functioning.

Expanding upon that analysis here, I begin with the documented history of treatment for symptoms attributed to one diagnosis of bipolar disorder since early 2015 at Signature Health Inc. with psychiatrist Denise Flynn, A.P.R.N.  [Tr. 521, 523, 570-572].  Medications included a mood stabilizer, Topamax; an atypical antipsychotic, Abilify; and a cognition-enhancing medication, Strattera 80mg.  The 2015 psychiatric progress notes are unremarkable, however, and reflect the ability to sustain at least part-time work activity at a McDonald's fast-foods restaurant [Tr. 597, 601, 609].  She applied for disability and presented back to her psychiatrist with irritability and mood swings, but she told an examining psychologist in February 2016 that her mental health was better with the same medications and a recently added antidepressant (Zoloft) working well, and that she was working part-time at another job at a Dick's Sporting Goods store [Tr. 371, 627].  That psychologist diagnosed bipolar disorder and inattentive-type ADHD, but noted her report of no history of problems interacting with supervisors or with coworkers at current or previous jobs, being able to work with the public in those jobs, and having a sustained relationship with her boyfriend (who was then residing with her) over three years [Tr. 372, 374-375].

With the claimant continuing to work up to 30 weekly hours in 2016, psychiatric progress notes remain largely unremarkable for any breakthrough symptoms and show a stable medication regime [Tr. 645].  Tremor was observed in early 2017 follow-up and occasioned a change in medications, for possible extrapyramidal effect of Abilify, and replaced that medication and Zoloft with Wellbutrin [Tr. 651].  Ms. Watts apparently did not take that replacement medication and had a notable

argument with front desk staff at Nurse Practitioner Flynn's office and had reportedly hung up the phone on a customer at her job [Tr. 664]. Similarly, in early 2018, she was off (not taking) Wellbutrin for two months and reported feeling an urge to engage in self-cutting behavior (but did not do so), that she had quit her job, and that she was facing potential jail time for shooting a neighbor with a beebee gun [Tr. 415, 694-695]. Her psychiatrist optimized the dosages of Wellbutrin and Topamax and had added Rexulti.

Later 2018 progress notes and some July 2018-September 2018 psychotherapy notes from Angela Tarantino, L.P.C, at Signature Health reported that she was working two part-time jobs but still having some hypomanic symptoms of bipolar disorder [Tr. 731, 737, *and see* Tr. 530, 540, 546, 550]. A December 2018 therapy note indicates "different" clinical presentation compared to previous sessions, with flat affect and slurred speech and tearful presentation, which appears to relate to the death of her ex-husband that she also reported to her psychiatrist [Tr. 560, 749].

The 2015-2018 medical evidence from Signature Health does account for a longstanding diagnosis of bipolar disorder and a need for ongoing psychiatric medication management, as well as some individual psychotherapy at least as documented in the latter half of 2018. But only in the instances of temporarily not taking one or more of her prescribed medications, and for extended periods thus not attributable to allegedly forgetting to do so, has she indicated problems with maintaining employment and experiencing active symptoms with difficulty interacting appropriately. None of these earlier mental health treatment notes record subjective reports of anxiety (or "panic") attacks after one reported in late 2015 (during a busy holiday shopping season), or an involuntary loss of employment due to having verbal or other altercations with others, and it is again noted that she previously denied such history at the 2016 consultative examination [*see* Tr. 615]. Her medication regimen as of the end of 2018 is remarkable for five total medications, but the Strattera had notably gone without any adjustment whatsoever, which suggests a high degree of benefit to any concentration issues. While I have clearly regarded such medical history of ongoing psychiatric treatment over years leading up to the alleged onset date, I do not find the symptoms of primarily diagnosed bipolar disorder to have been as historically persistent and intense as alleged in connection with this application.

Turning to the past two years of continuing psychiatric treatment, I acknowledge that Ms. Watts had reported to Nurse Practitioner Flynn and to her counselor in February 2019 that she was psychiatrically hospitalized at another mental health treatment facility (Windsor Laurelwood) for self-cutting behavior in response to multiple stressors in her home and family situation and a problematic romantic relationship with a married man [Tr. 565, 755]. While such hospitalization fairly coincides with the alleged onset date, her symptoms of depression and anxiety came under stability and control with additional medication, Vistaril, and she stated to her counselor that coloring helps to manage thoughts to cut herself [Tr. 570, 761, 767]. Subsequently, the May 2019 car accident evoked feelings of manic mood,

irregular sleep, and the first reported panic attack; but Ms. Watts still reported overall stable mood with continued use of the same medications she had been taking in the previous year (Wellbutrin, Prozac, Vraylar, and Topamax), she expressed that she did not want any change made to the medications, and she added that taking Vistaril helped with the panic attack and the anxiety overall is reduced and "not a major concern" [Tr. 772-773]. These statements are fairly consistent with the testimony regarding rather low frequency of anxiety attacks that come under control within 15 minutes of using a prescribed medication, but they are not consistent with the alleged lack of control of her mood-related symptoms of bipolar disorder, which notably remained her sole diagnosis from Nurse Practitioner Flynn throughout 2019.

Ms. Watts presented differently at two visits in August 2019, conspicuously stating that Vistaril no longer helps with anxiety and that her sleep was irregular after her psychiatrist told her that her request for a benzodiazepine-based anxiolytic (Ativan, specifically) or for a psychostimulant (instead of Strattera) was being denied because of marijuana use [Tr. 779, 786, 792]. Nurse Practitioner Flynn added low-dose (5mg) Abilify back to the medication regimen, which improved her mood and increased sleep effectively [Tr. 786, 792]. The reported marijuana use in August 2019 was met with assertions that she would agree to stop using it and that she does not smoke it every day, but these statements in the psychiatric notes conflict with her testimony that she has not used marijuana in the past three years before the hearing.

Late 2019, January 2020, and April 2020 progress notes reflect some periods of depression secondary to financial stressors, but still improved mood on the same medications [Tr. 805, 811]. Nurse Practitioner Flynn did record the incident in June 2020 relating to her being "banned" from shopping at her local Wal-Mart store due to an altercation with store staff [Tr. 828]. But three later 2020 progress visits (all via telephone due to the COVID-19 Pandemic) detail that the medications were working to her satisfaction for managing her mood and depression, do not reflect further mentioned anxiety or panic attacks, and reflect completely stable types and dosages of the five medications that she had been taking for over a year previously—i.e., Wellbutrin 150mg, Prozac 60mg, Abilify 5mg, Vistaril 50mg (up to three times daily as needed), and Strattera 80mg [Tr. 828, 835, 842, 849].

Throughout 2019-2020, Nurse Practitioner Flynn has returned consistently unremarkable findings on mental status examinations with exception for chronically labile, depressed, or anxious mood and affect; and has specifically noted alert and well-oriented cognition, normal attention and focus/concentration, normal rate and volume of speech with normal language and evidencing goal-directed thought processes, cooperative behavior, good eye contact, and good attention shown to personal hygiene [Tr. 746, 752, 758, 764, 770, 776, 783, 789, 795, 802, 808, 825, 831-832, 838-839, 845-846]. She did not document any observed deficits in recent or remote memory abilities, but also did not note any presenting complaints of forgetfulness as alleged in testimony at the hearing. She

9

also noted Ms. Watts's consistent denials of having any abnormal thoughts, including suicidality and harming others, with no further instances of urges to cut herself for releasing emotional pain.

These mostly unremarkable clinical observations from the claimant's psychiatrist over the past two years are much more consistent with the stabilizing medication regimen and subjective reports made in the treatment setting than with the testimony and written reports alleging unremitting persistence and worsening intensity of bipolar-related symptoms and depression despite the use of medications. Such medical evidence is also more consistent with her primary care practitioner's observations during 2020 office visits, including the claimant's pleasant or cheerful demeanor during in-person visits or phone conversations, normal affect, normal cognition and speech with no apparent deficits to learning or comprehension, and alert and oriented mental status in all spheres [*see e.g.*, Tr. 1114, 1126, 1166]. In fact, Mr. Barton noted bipolar disorder (as of August 2020) "in full remission" and that the claimant was doing well with medication [Tr. 1115].

In summary, the longitudinal medical evidence from the claimant's psychiatrist over the past two years, supplementary observations by her primary care doctor over the last year, and the historically relevant medical evidence over 2015-2018 are no more than partially consistent with the claimant's alleged intensity, persistence, and functionally limiting effects of bipolar-related symptoms, anxiety attacks, and symptoms affecting concentration or memory from those conditions or ADHD. I again find no more than mildly limited abilities supported by such evidence in the broad areas of work-related mental functioning for understanding/memory, sustained concentration/persistence, and adaptation, and only moderately limited abilities to interact with supervisors, with coworkers, and with members of the public in a work setting. While other factors considered below also support such finding, the claimant's consistently cooperative behavior and mostly unremarkable presentations to her psychiatrist and to other medical sources outweigh the limited reports of becoming angry and engaging in verbal arguments with others. In a work setting wherein she would have only occasional interactions with all others, including the public, I find no other limitation in her abilities to meet the basic mental demands of work activity on a regular and continuing basis.

### Other Evidentiary Factors (SSR 16-3p)

Ms. Watts has a work history dating back to 1996 that has some gaps in any recorded employment and earnings mostly falling below levels of substantial gainful activity, with notable exception in years 2013-2015 [*see generally* Tr. 280-282]. While alleging many losses of employment due to her bipolar-related symptoms, the historical psychiatric treatment notes in 2015-2017 document several reports of sustained work activity, albeit in part-time jobs, in positions and settings that required direct customer service and interaction with members of the public. Examples include a job at a Circle K gas station that lasted for two years and a job at a Dick's Sporting Goods retail store from late 2015 through late 2017

[Tr. 571, 616, 627, 633, 638, 645, 651, 657].  The job at Dick's reached high part-time level (30 hours per week) and ended because of a new and apparently difficult supervisor.  Other statements she made in connection with psychiatric treatment reflect that she has lost jobs for reasons not related to acting inappropriately towards others, but rather for being caught smoking on the premises and simply not showing up for work regularly as scheduled [Tr. 571, 580, 799].  The types of jobs held do not suggest a marked or serious degree of limitation in her abilities to interact with others, including members of the public, and these other factors from the psychiatric treatment notes are not entirely consistent with the alleged connection between her work record and symptoms of bipolar disorder or other psychological conditions.

Returning to the alleged side effects from several of her medications, Ms. Watts has not reported any sleepiness or grogginess to Nurse Practitioner Flynn as perceived after taking Wellbutrin or Prozac [Tr. 320].  Potential side effects of newly added medications were routinely discussed per the progress notes, but no record indicates that Ms. Watts has reported these alleged side effects to their prescribing source.  I again regard the reported or observed generalized tremor or specific hand tremor by the psychiatrist and at one primary care visit in September 2019, which the psychiatrist posited as a possible effect from long-term use of prescribed Topamax [Tr. 392, 651, 779, 786, 792, 805].  The tremor has not occasioned any documented evaluation by a neurologist and, per Mr. Barton's physical examination, did not affect gross motor strength of the bilateral upper and lower extremities and only modestly impacted grip strength with the one (right) hand.  The tremor as possible side effect of long-term use of a mood-stabilizing medication has been considered in the limitations to sedentary-level lifting and carrying of only 10 pounds occasionally and in the precluded abilities to climb ladders and the like and being able to work around certain hazards, but the primary care practitioner's objective signs do not support any additional limitations in other physical work-related abilities.

Ms. Watts has alleged that she requires physical assistance from others, whether her boyfriend or her children, to assist her with self-care tasks for bathing, dressing, and grooming, and she has similarly reported those issues to the physical therapist and at the closely occurring FCE [Tr. 314; *and see* Tr. 950, 1145].  She has also stated that, since the February 2020 car accident, she cannot perform any yard work or carry groceries into her house, can only do laundry with help from others, can cook and do light housework with breaks, and can shop for groceries but only while using a store-provided "scooter" [Tr. 950].  She testified that she sits while cooking meals for herself and her 15-year-old son and can do light cleaning tasks for 15-minute periods, but has not cleaned over the past month and has had a friend come over her home to clean.

Although the claimant has described daily activities that reflect significant limitations from the physical perspective and symptom of chronic back and sciatica-type pain, two general factors weigh against considering these allegations

11

to be strong evidence in favor of any greater exertional or other limitations beyond the occasional standing and walking in sedentary work and occasional performance of most postural positionings, as supported by the preceding analysis of the medical evidence. First, allegedly limited daily activities cannot be objectively verified with any reasonable degree of certainty. Second, even if the claimant's daily activities are truly as limited as alleged, it is difficult to attribute that degree of limitation to her medical conditions, as opposed to other reasons, in view of the relatively weak medical findings for any weakness in the legs or arms shown on limited physical examinations, conservative treatment offered to-date via physical therapy and over-the-counter remedies that only relatively recently progressed to prescribed Lodine medication, and other factors discussed above. Overall, the claimant's reported limited daily activities are considered to be outweighed by the other factors discussed in this Finding and otherwise not supportive of any greater functional limitations than the range of sedentary work set forth above.

In terms of the alleged issues getting along with others, including her few friends and family members, Ms. Watts has been living with one or two of her children, she drove to visit her daughter who lives outside the home about a month before the hearing, and she has had a boyfriend who reportedly has been living with her over the week before the hearing. She has relationships with friends, including the friend that she had accompanied to the Wal-Mart store and argued on his behalf for about the store not accepting his return, and another friend mentioned in connection with psychiatric treatment that she temporarily let stay at her house [*see* Tr. 805]. Per testimony, she does shop in stores for groceries with her son, she makes quick shopping trips to gas stations, and she uses Facebook. In sum, the claimant has described relationships and activities outside the home that are not suggestive of marked or serious problems in getting along with others and further support my finding that she would be limited to, but capable of having, only occasional interactions with both familiar others (supervisors and coworkers) and unfamiliar individuals (members of the public) over the course of a workday.

Based on the foregoing analysis, I conclude that the claimant's statements about the intensity, persistence, and functionally limiting effects of pain and other symptoms are only partially consistent with the medical evidence and other evidence in the record, to the extent reflected in this Finding of residual functional capacity for a range of sedentary exertion work and with mental abilities only significantly limited in social interactions. Neither the objective medical evidence and other medical factors discussed above nor these other relevant evidentiary factors support greater physical or social interactional restrictions, any other limitations in specific work-related abilities whether in mental functioning or in manipulative (as contended by the claimant's attorney in a post-hearing letter), or a finding that, when so limited to the foregoing range of sedentary work, the claimant's pain, psychological symptoms, and any other symptoms would cause her to be absent one day per week and/or to be off task (unable to maintain concentration and persistence for work tasks) during a workday.

***Medical Opinion(s) and Prior Administrative Medical Findings***

Pursuant to 20 CFR 404.1520c(a), I cannot defer or give any specific evidentiary weight, including controlling weight, to any prior administrative medical findings or to any medical opinion(s), including those from the claimant's own medical sources.  Accordingly, in the analysis that follows, I have fully considered the medical opinions offered by the claimant's own medical sources, as well as the prior administrative medical findings from State agency medical consultants (MCs) and psychological consultants (PCs), in a manner following the requirements of 20 CFR 404.1520c(b).

[* * *]

On October 31, 2020, Mr. Gregory Barton responded to a form-based medical opinion and offered that the claimant's chronic low back pain with sciatica, morbid obesity, and "asthma" would prevent her from standing or walking for even two hours of a workday, would also limit her ability to sit for less than two hours "without position change," would warrant a need for her to have the "freedom to shift at will" between sitting and standing/walking positions, would limit lifting and carrying to 10-20 pound range occasionally and less than 10 pounds frequently, and would cause her to be absent four times per month [Tr. 821].

Mr. Barton's medical opinion for less than sedentary abilities as maximum physical functional capacity, for apparently four total hours of maximum working ability, for at-will position changes between sitting and standing/walking, and for four monthly absences is not persuasive.  Mr. Barton did offer a list of the claimant's diagnoses and related symptoms, but his own cited treatment via nonsteroidal anti-inflammatory drugs and muscle relaxers, physical therapy, and osteopathic treatments reflect a conservative approach to managing the chronic back and sciatica pain that is not proportionate with these extreme physical functional and general work-related abilities.  Moreover, his rationale made no effort to discuss his own clinical observations and medical signs from physical examinations, which the preceding analysis shows to have been rather unremarkable in terms of any weakness in the lower extremities or abnormal gait [see, e.g., Tr. 392].  The sitting limitation and need for at-will position change is not even consistent with the claimant's own testimony at the hearing or with her statements made to the FCE within the same month as this opinion was authored.  That is, she identified sitting as her most comfortable position at the FCE, and she testified that she can sit for one to two hours such as when driving before she would need to stand and stretch.  Overall, there was no objective medical support offered for this opinion, the sitting limitation and need for position changes is not supported even by the claimant's own subjective reports, and the progression in treatment to physical therapy and prescription-strength pain medication had just commenced a month before the opinion was offered.

Additionally, I note that Mr. Barton's opinion about four monthly absences was offered with a handwritten statement that the claimant "has mental illness which

creates sense of incapacity" and that he listed her other diagnosis of bipolar disorder.  The opinion for monthly absences based in part on psychological issues is also not persuasive because the statement offered has no similar documentation in Mr. Barton's 2019 and 2020 office notes, and because it conflicts entirely with his own diagnosis of bipolar as "in full remission," with his report that the claimant was doing well with outside-prescribed medications, and with his unremarkable clinical observations relating to the claimant's psychiatric mental status at a few office visits [*see* Tr. 1115].  Thus, the monthly absences are not supported by Mr. Barton's own medical reports and, for reasons discussed below, are also not consistent with other evidence from the claimant's treating psychiatrist.

In final regard to the late October 2020 statement offered by the claimant's primary care practitioner, it contains a negative (No) response to the following question: "In your professional opinion, is your patient capable of performing a full-time job that is 8 hours per day, five days per week, on a regular and continuing basis?"  Such a question and Mr. Barton's answer thereto are inherently neither valuable nor persuasive because they do not reflect a "medical opinion" but constitute a statement relating only to the administrative issue of whether the claimant is able to engage in regular and continuing work, which is reserved to the Commissioner of Social Security and his designees (20 CFR 404.1520b(c)(3)).

[* * *]

During the post-hearing development, the claimant's attorney produced a December 14, 2020 response to a form-based medical opinion from Nurse Practitioner Denise Flynn, the claimant's psychiatrist since 2015 [Tr. 852-853].  In "check-off" responses to direct questions, Nurse Practitioner Flynn opined that the claimant cannot tolerate any work stress, cannot sustain even simple routine tasks/unskilled work, and would need to take unscheduled breaks during a workday, would be off task more than 20% of the time, would be tardy or need to leave work early four times or more over the course of a month, and would be absent three days per month due to mental health issues.  She did not give an opinion on whether the claimant could maintain attention and concentration for two-hour intervals ("uncertain").  Yet, in broad aspects of mental functioning that correspond to the "paragraph B" criteria of the listings, Nurse Practitioner Flynn rated the claimant as having a mild limitation in understanding/remembering/applying information and moderate limitations in interacting with others, concentrating/persisting/ maintaining pace, and adapting/managing oneself [Tr. 853].  She also indicated that the claimant can occasionally (up to one-third of a workday) handle interacting with supervisors and coworkers and can frequently (up to two-thirds of the workday) handle interacting with the public.

The December 2020 medical opinion from the claimant's psychiatrist is not persuasive for a number of reasons.  First and foremost, the opinion contains several internally conflicting statements, such as regarding the claimant's inability to sustain mental work or tolerate any stress and yet having only moderately limited

14

abilities in broad respects.  Second, she provided weak rationale for the seriously limited mental abilities with "mood is variable," "as evidenced by work history," and only partially decreased symptoms from "multiple trials" of medications.  Not only are these terse statements unpersuasive, but they are not well supported by her own longitudinal progress notes that reflect no clinically observed variability of mood and a rather stable medication regimen since late 2019 in both dosages and types of antidepressant, mood-stabilizing, and antianxiety medications as well as a years-long stable dosage of cognition-enhancing Strattera for ADHD.  The stable clinical observations and medication regimen undermines her citing the claimant's work history as sole support for her opinion that she could not sustain even unskilled mental demands of work activity.  Additionally, this opinion is not consistent with the other medical evidence consisting of the primary care practitioner's benign observations on brief psychiatric examinations at 2020 office visits.  The only aspect of the psychiatrist's medical opinion that are persuasive in part are for mildly limited abilities in the first area of mental functioning and moderate limitation in interacting with others and corresponding ability to have occasional interactions in the workday, which are more consistent with her own chronology of progress notes and with the claimant's own functioning to include retained relationships with her boyfriend and other friends as noted in the record.

Finally, the form provided to Nurse Practitioner Flynn also contains a direct question as to whether she believes the claimant (her patient) is able to "work full-time," and her negative response to that particular question on the form is inherently neither valuable nor persuasive because it is not a "medical" issue but rather a statement relating only to the administrative issue of whether the claimant is able to engage in regular and continuing work, which is reserved to the Commissioner of Social Security and his designees [Tr. 852] (20 CFR 404.1520b(c)(3)).  Such statement was also poorly and unconvincingly reasoned on "mood [and] attention are variable," which are not well supported by her own progress notes showing stable mood and alert attention with normal focus.

(Tr. 117–131).

## C.    Relevant Opinion Evidence

### 1.    Medical Opinion – Gregory Barton, P.A.-C.

On October 31, 2020, Barton completed a medical opinion form regarding Watts's ability to perform work-related activities.  (Tr. 821).  He indicated that, in his opinion, she was not able to perform a full-time job, 8 hours a day, five days a week, on a regular and continuing basis.  *Id.* He noted that he had been treating Watts since May 31, 2019; she had diagnoses of bipolar disorder, chronic lower back pain, sciatica, morbid obesity, and asthma; and her signs and

symptoms included: "mood fluctuations, chronic back & leg pain, obesity R/T [related to] genetics & medication side effects & asthma s'x [symptoms]." *Id.* He noted he treated her with physical therapy, osteopathic treatments, medications, NSAIDS, and muscle relaxants. *Id.* As support for his medical findings, he only wrote "see notes." *Id.*

As to Watts's abilities, Barton indicated, without explanation, that she was limited in her ability to walk and stand, with the maximum amount of time she could do so during an 8-hour workday being less than 2 hours; she was limited in her ability to sit; she could frequently lift or carry less than 10 pounds; she needed the freedom to shift at will between positions; and she did not need to lie down at unpredictable times during an 8-hour workday. *Id.* Specifically, he noted that Watts could sit less than 2 hours during an 8-hour workday, writing that he had recommended functional capacity testing without positional change. *Id.* He also wrote that he could not quantify her ability to lift or carry, and his limitation was simply an estimate. *Id.* As to "[o]ther limitations" Barton wrote: "patient has mental illness which creates sense of incapacity." *Id.* He then indicated that he anticipated that her conditions and related symptoms or treatment would keep her absent from work 4 or more times a month. *Id.*

## 2.    Medical Opinion – Denise Flynn, APRN

On December 14, 2020, Flynn completed a medical opinion form regarding Watts's ability to perform work-related activities. (Tr. 852-853). She indicated that she had treated Watts every 1 to 3 months since August 2011, and that her diagnoses were attention deficit hyperactivity and bipolar disorder. (Tr. 852). She wrote that Watts "has had multiple trials of medication with only partial [reduction in] symptoms," noting she prescribed Prozac, Wellbutrin, Abilify, Vistaril, and Strattera. *Id.* She indicated that Watts did not have any current side effects, but had previously. *Id.*

Flynn indicated that she did not think Watts could work full-time, noting her "mood + attention are variable," and that Watts could not sustain any mental requirements at work "as evidenced by [her] work history." *Id.* Flynn was "uncertain" whether Watts could sustain her attention and concentration in two-hour intervals and noted that "at time[s]" Watts would require breaks more frequently than every two hours, noting that it depended on her moods and symptoms. *Id.* She also indicated that Watts would be off-task more than 20% of the workday. *Id.* It appears that Flynn also indicated that Watts could not engage in any work stress, could engage with her supervisors and coworkers up to 1/3 of the workday, and with the public of to 2/3 of the time. (Tr. 853). She noted that Watts could not be expected to reliably attend work five days a week, estimating she would be absent due to mental issues 3 times a month and would be more than a few minutes later to work or leave early 4 or more times a month. *Id.* Flynn opined that Watts had only mild functional limitations in her ability to understand, remember, or apply information; and only moderate limitation in the remaining three areas of mental functioning. *Id.*

### D.  Relevant Testimonial Evidence

Brett Salkin, a vocational expert, testified at the administrative hearing. (Tr. 178-181). The VE testified that a hypothetical individual of Watts's age, experience, and with the ALJ's proposed limitations, "could incur an absence event ongoing no more than once a month to sustain competitive employment." (Tr. 180).

## III.  Law & Analysis

### A.  Standard of Review

The court's review of the Commissioner's final decision denying disability benefits is limited to "whether the ALJ applied the correct legal standards and whether the findings of the

ALJ are supported by substantial evidence." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009). Substantial evidence exists "if a reasonable mind might accept the relevant evidence as adequate to support a conclusion," *id.* at 406 (internal quotation marks omitted), even if a preponderance of the evidence might support the opposite conclusion. *O'Brien v. Comm'r of Soc. Sec.*, 819 F. App'x 409, 416 (6th Cir. 2020). However, the ALJ's decision will not be upheld when the ALJ failed to apply proper legal standards and the legal error prejudiced the claimant. *Rabbers v. Comm'r SSA*, 582 F.3d 647, 654 (6th Cir. 2009). Nor will the court uphold a decision when the Commissioner's reasoning does "not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp.2d 875, 877 (N.D. Ohio 2011) (internal quotation marks omitted).

### B. Step Four: Medical Opinion

Watts contends that the ALJ erred in his analysis of the medical opinions of Barton and Flynn, specifically because the ALJ's reasons for finding the various opinions only partially persuasive were not supported by the evidence. ECF Doc. 8 at 12. As to Flynn, Watts argues that the ALJ's reasons for rejecting Flynn's opinion were inaccurate because (i) Flynn's assessment of Watts's mental health limitations were not internally inconsistent, and (ii) Flynn's rationale for seriously limited mental abilities were supported by her treatment notes. ECF Doc. 8 at 15. As to Barton, Watts argues that the ALJ failed to sufficiently explain why he did not adopt portions of Barton's opinion, specifically his limitations that Watts needed to be able to shift her weight at will, that she could only frequently lift 10 pounds, and his opinions concerning Watts's absenteeism. ECF Doc. 8 at 13-14. She asserts that: (i) Barton listed diagnoses and cited his treatment, (ii) the lack of discussion of Barton's own observations should be rejected as a basis for the ALJ's unpersuasive finding, (iii) Barton did not base his

absenteeism limitation on psychological issues, and (iv) Barton's opinions are consistent with the functional capacity evaluation.  ECF Doc. 8 at 14.  The Commissioner disagrees.  *See* ECF Doc. 9.

At Step Four of the sequential evaluation process, the ALJ must determine a claimant's RFC after considering all the medical and other evidence in the record.  20 C.F.R. § 404.1520(e). In doing so, the ALJ is required to "articulate how [he] considered the medical opinions and prior administrative medical findings."  20 C.F.R. § 404.1520c(a).  At a minimum, the ALJ must explain how he considered the supportability and consistency of a source's medical opinion(s), but generally is not required to discuss other factors.  20 C.F.R. § 404.1520c(b)(2)[5].  According to the regulations, the more consistent a medical opinion is with the evidence from other medical and nonmedical sources, the more persuasive the medical opinion will be.  This is the consistency standard.  And the regulation specifies that the more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion, the more persuasive the medical opinion will be.  This is the supportability standard.  *See* 20 C.F.R. § 404.1520c(c)(1)-(2).

Although the ALJ generally applied the correct legal standards or harmlessly erred in doing so in the evaluation of Flynn and Barton's opinions, his evaluation of Barton's absenteeism limitation was based on faulty reasoning and, thus, should be remanded for further consideration.  *Blakley*, 581 F.3d at 405.  Because Watts limits her contentions to the sufficiency of the ALJ's explanation of the factors under 20 C.F.R. § 404.1520c(c) the court's review can be

---

[5] Other factors include: (1) the length, frequency, purpose, extent, and nature of the source's relationship to the client; (2) the source's specialization; and (3) "other factors," such as familiarity with the disability program and other evidence in the record.  20 C.F.R. § 404.1520c(c)(3)-(5).

accordingly circumscribed to the sufficiency of the ALJ's discussion of the factors and the soundness of the reasons given for discounting Barton's and Flynn's opinions.

As to Flynn, Watts's contentions are unavailing.  First, as to Flynn's "internally conflicting statements," Watts's reading of the ALJ's decision is unreasonably exacting.  As an example of the conflicts concerning to the ALJ, he wrote "such as regarding the claimant's inability to sustain mental work or tolerate any stress and yet having only moderately limited abilities in broad respects." (Tr. 130).  This is not, as Watts appears to read it, the ALJ attempting to manufacture a conflict between the mental areas of functioning.  Rather, the ALJ compared Watts's "inability to sustain mental work" with the findings regarding Flynn's other moderate limitations.  To read it as a strict comparison of the areas of mental functioning is to overread the ALJ's decision and miss his concern over the seemingly divergent opinions on Watts's abilities.

Further, although the ALJ's finding that Flynn's treatment notes did not support mood variability is erroneous, the error was ultimately harmless in light of the other reason provided and the substantial evidence supporting it.  *See Blakley*, 581 F.3d at 405.  Watts contends that the ALJ erred in finding that Flynn's treatment notes did not support her opinion because her notes routinely identified a labile mood, anxiety, and medication changes.  ECF Doc. 8 at 15.  Of those, however, only Watts's labile mood and medication changes would actually undermine the ALJ's reasoning that Flynn's explanations for her opinions was weak.  A review of Flynn's notes, shows that Watts is correct.  Rather than "reflect[ing] no clinically observed variability of mood," all of the notes from 2019 to 2020 the ALJ cited in his summary of the evidence indicate Watts's mood was labile.  (*See* Tr. 123, 130, 746, 752, 758, 764, 770, 776, 783, 789, 795, 802, 808, 825, 831-832, 838-839, 845-846).

However, even if we were to disregard that portion of the ALJ's reasoning, the ALJ's

supportability finding also relied on the stabilization of Watts's medication over the same period,

which *is* reflected in Flynn's treatment notes.  *See Blakely*, 581 F.3d at 406; (Tr. 130, 743, 749,

755, 761, 767, 773, 779-780, 786, 792, 798, 805, 811, 828, 835, 842, 849-850).  As a result, the

ALJ's conclusion that Flynn's opinion was unpersuasive – based on his erroneous conclusion

that Flynn's treatment records provided no clinical support for the opinion that Watts's moods

were variable – was ultimately harmless and not a ground for remand.  *See Rabbers*, 582 F.3d

at 654 (holding that the ALJ's failure to adhere to a procedural rule is harmless unless the

claimant was prejudiced or deprived of substantial rights).

Turning to Barton, Watts challenges three of the reasons given by the ALJ for rejecting

some of Barton's proposed limitations: (i) Barton did not list Watts's diagnoses and related

symptoms, but cited his own treatment; (ii) Barton made no effort to discuss his own clinical

observations and medical signs from examinations; and (iii) Barton's opinion about Watts's

probable absenteeism was based on a mental – rather than a physical – impairment.  *See* ECF

Doc. 8 at 14.  I do not agree with Watts's analysis of the ALJ's conclusions regarding PA

Gregory Barton.

I find that Watts's claim that the ALJ discounted the Barton opinion because he failed to

list Watt's diagnoses but only cited his treatment modalities is not correct.  The ALJ stated that

Barton, "*did* offer a list of the claimant's diagnoses and related symptoms," but found that

Barton's treatments were mostly conservative and, thus, "not proportionate with these extreme

physical functional and general work-related abilities."  (*See* Tr. 128; emphasis added).  Thus,

this portion of Watts's claim fails because of factual inaccuracy.

Likewise, Watts's attack on the ALJ's second reason for discounting the Barton opinion is unavailing.  The ALJ faulted Barton because his opinion, "made no effort to discuss his own clinical observations and medical signs from physical examinations."  (Tr. 128).  And the ALJ found that omission to be suspect, because his own analysis of Watt's symptoms from Barton's treatment records showed them to be "rather unremarkable in terms of any weakness in the lower extremities or abnormal gait."  (*Id.*)  Watts essentially criticizes the ALJ for failing to mention that "Barton [was] aware of plaintiff's condition, the objective MRI evidence and plaintiff's ongoing allegations which support his opinion in this respect."  ECF Doc. 8 at 14.  This argument fails for two reasons: first, Watts has cited nothing from the record that supports her contention.  And second, she has cited no law which requires the ALJ to credit a provider's general awareness of information in a claimant's medical chart as providing a basis for an opinion.  In fact, that approach would be contrary to the supportability standard in 20 C.F.R. § 404.1520c(c)(1), which contemplates that medical opinions can be found persuasive when the provider draws from his or her own clinical observations and examination findings to support opined limitations.  To contend that the ALJ should have credited Barton's purported "awareness" of other unspecified evidence – that Barton himself did not cite – would have required the ALJ to essentially craft the foundation for a medical opinion based on what he *assumes* Barton had for a basis.  And that would have required the ALJ to "play doctor."  *See Winning v. Comm'r of Soc. Sec.*, 661 F. Supp. 2d 807, 823-24 (N.D. Ohio 2009) ("[A]n ALJ 'does not have the expertise to make medical judgments.'").

Conspicuously absent from the Commissioner's response brief, however, is any defense of the ALJ's third reason for finding Barton's opinion (about Watts's anticipated absenteeism) unpersuasive.  *See* ECF Doc. 9 at 8-13.  Barton opined that Watts had diagnoses of "bipolar

disorder, chronic low back pain with sciatica, morbid obesity and asthma." (Tr. 821). For signs and symptoms, Barton indicated Watts exhibited, "mood fluctuations, chronic back & leg pain, obesity R/T [related to] genetics & medication side effects & asthma s'x [symptoms]." (*Id.*). Under the heading "Other limitations," Barton stated: "patient has mental illness which creates a sense of incapacity." (*Id.*) On the next line on the form was the question, "On average, how often do you anticipate that your patient's impairments, conditions, symptoms and treatment would cause him or her to be absent from work?" Barton checked the box indicating "≥ 4 x/month." (*Id.*)

The ALJ appears to have conflated Barton's opinion on Watts's absenteeism with his statement listing Watts's "other limitations," because the ALJ opinion contains an entire paragraph explaining how an opinion that Watts would be absent due to her bipolar disorder directly conflicted with Barton's treatment notes which indicated: that Watts's bipolar disorder was in full remission, that she was doing well on medication and that set forth only unremarkable clinical observations regarding Watt's psychiatric mental status. (Tr. 128).

It is quite evident that the ALJ misconstrued Barton's opinion. Although it is true that Barton stated Watts had an "Other limitation" of "mental illness that created a sense of incapacity," that was *not* the sole support for his conclusion that Watts would be absent from work four or more times per month. Rather, Barton expressed his absenteeism opinion based on "the patient's impairments, conditions, symptoms, and treatments." While it may well have been correct for the ALJ to find that any Barton opinion that Watts would miss work due to mental health issues was not supported by his own clinical records, that is not what Barton opined. And, unfortunately, because the ALJ did not address how supportable or consistent Barton's actual

absenteeism opinion was, we are left with an incomplete administrative review of the opinion evidence; this violated the requirements of the regulations.  *See* 20 C.F.R. § 404.1520c(a).

The ALJ's error in the analysis of Barton's opinion could be harmless if the lack of substantial evidence to support an absenteeism limitation had been discussed elsewhere in the ALJ decision.  However, reading the ALJ's decision as a whole fails to provide any discussion of how, despite her complaints and the Barton opinion, Watts had demonstrated the ability to attend to things on such a regular basis that the ALJ could reject *any* absenteeism limitation.  As the vocational expert identified, in his opinion, "a person could incur an absence event ongoing no more than once a month to sustain competitive employment."  (Tr. 180).

Finally, I conclude that the ALJ's analysis of the absenteeism issue was insufficient to build a logical bridge between the evidence and the ALJ's conclusion; and it was insufficient to permit the court to determine whether it was supported by substantial evidence.  *See Fleischer*, 774 F. Supp.2d at 877.

## IV.    Recommendation

Because the ALJ failed to apply proper legal standards in rejecting Barton's proposed absentee limitation, I recommend that the Commissioner's final decision denying Watts's application for DIB be vacated and that Watts's case be remanded for further consideration.


Dated: April 19, 2023

Thomas M. Parker
United States Magistrate Judge

**Objections, Review, and Appeal**

Within 14 days after being served with a copy of this report and recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of the magistrate judge.  Rule 72(b)(2), Federal Rules of Civil Procedure; *see also* 28 U.S.C. § 636(b)(1); Local Rule 72.3(b).  Properly asserted objections shall be reviewed de novo by the assigned district judge.

Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the report and recommendation.  *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019).  Objections must be specific and not merely indicate a general objection to the entirety of the report and recommendation; "a general objection has the same effect as would a failure to object." *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991).  Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the magistrate judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them, and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 U.S. Dist. LEXIS 100383, *6 (W.D. Ky. June 15, 2018) (quoting *Howard*).  The failure to assert specific objections may in rare cases be excused in the interest of justice.  *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).